

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO**

FILED
JAMES BONINI
CLERK

05 SEP 16 PM 3: 19

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

THE BOOTH FAMILY TRUST, by )
CHARLES FEDERMAN, TRUSTEE, )
Derivatively on Behalf of Nominal Defendant, )
ABERCROMBIE & FITCH COMPANY, )
 )
        Plaintiffs, )

**C 2   05   8 6 0**

v. )

Case No.

 )
MICHAEL S. JEFFRIES, ROBERT S. SINGER, )
RUSSELL M. GERTMENIAN, ARCHIE M. )
GRIFFIN, JAMES B. BACHMANN, LAUREN J. )
BRISKY, JOHN W. KESSLER, JOHN A. )
GOLDEN, EDWARD F. LIMATO, )
 )
        Defendants, )
 )
v. )
 )
ABERCROMBIE & FITCH COMPANY, )
 )
        Nominal Defendant. )

JUDGE FROST

MAGISTRATE JUDGE KEMP

**SHAREHOLDERS DERIVATIVE
COMPLAINT**

Plaintiff by his attorneys submits this Complaint against the Defendants named herein.

## NATURE OF THE ACTION

This is a shareholders derivative action brought for the benefit of Nominal Defendant

Abercrombie & Fitch Company ("Abercrombie & Fitch" or "Abercrombie" or the "Company")

against Defendants Michael S. Jeffries ("Jeffries"), Robert S. Singer ("Singer"), Russell M.

Gertmenian ("Gertmenian"), Archie M. Griffin ("Griffin"), James B. Bachmann ("Bachmann"),

Lauren J. Brisky ("Brisky"), John W. Kessler ("Kessler"), John A. Golden, ("Golden") and

Edward F. Limato ("Limato").

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

2.      This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would otherwise not have.

3.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein occurred in this district. Defendants either reside in or maintain executive offices or participated in board meetings in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business here.

## PARTIES

4.      Plaintiff, The Booth Family Trust, is and was a shareholder of Nominal Defendant Abercrombie & Fitch during the time period in which the wrongful conduct alleged herein occurred through the present. The Booth Family Trust brings this action through its Trustee, Charles Federman, a citizen and resident of New Jersey.

5.      Nominal Defendant Abercrombie & Fitch is a Delaware corporation that maintains its principal executive offices at 6301 Fitch Path, New Albany, Ohio, 43054. Abercrombie & Fitch is a specialty retailer of high quality, casual apparel for men, women, and children. Abercrombie & Fitch sells its merchandise through retail stores throughout the United States and through catalogs. The Company also operates 3 e-commerce websites. Abercrombie & Fitch has four apparel brands, Abercrombie & Fitch, Abercrombie, Hollister Co. and its newest brand, RUEHL.

6. Defendant Jeffries has served as the Chairman of the Company's Board of Directors since May, 1998 and as its Chief Executive Officer since February 1992. Defendant Jeffries sold more than 1.6 million shares of Abercrombie & Fitch common stock reaping $118 million in proceeds in July 2005 alone based on negative material Company information known to him but not known to the public. Jeffries is a citizen and resident of Ohio.

7. Defendant Kessler has been a director of the Company since 1998 and is a member of the Company's Board of Directors' Compensation Committee. Kessler is a citizen and resident of Ohio.

8. Defendant Griffin has been a director of the Company since 2000 and is a member of the Company's Board of Directors' Compensation Committee. Griffin is a citizen and resident of Ohio.

9. Defendant Bachmann has served as a director of the Company since 2003 and is a member of the Company's Board of Directors' Audit Committee. Bachmann is a citizen and resident of Ohio.

10. Defendant Brisky has served as a director of the Company since 2003 and is a member of the Company's Board of Directors' Audit Committee. Brisky is a citizen and resident of Tennessee.

11. Defendant Gertmenian has served as a director of the Company since 1999. Gertmenian served as a member of the Company's Board of Directors' Audit Committee until April 13, 2004. Gertmenian is a citizen and resident of Ohio.

12. Defendant Golden has served as a director of the Company since 1998 and is the Chairman of the Company's Board of Directors' Audit Committee. Golden is believed to be a citizen and resident of New York.

C:\Documents and Settings\smaurer\Local

13. Defendant Limato has been a director of the Company since 2003. Limato is believed to be a citizen and resident of California.

14. Defendant Singer was until his August 31, 2005 departure, the Company's President and Chief Operating Officer and held these positions since May 2004. Defendant Singer was a director of the Company from May 2004 through June 2005. Following the April 15, 2005 resignation of Chief Financial Officer, Susan J. Riley, and until August 8, 2005, Singer assumed the responsibility of the Company's principal financial officer. Singer is not a resident of New Jersey and is believed to be a citizen and resident of Ohio or Italy.

15. The Company's current Board of Directors consists of ten (10) members, Defendants Gertmenian, Griffin, Bachmann, Brisky, Jeffries, Kessler, Golden and Limato and Alan A. Tuttle ("Tuttle") and Daniel J. Brestle ("Brestle").

## DUTIES OF THE INDIVIDUAL DEFENDANTS

16. By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care. Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company. In addition, the Defendant Directors owed a duty to the Company and its shareholders to implement adequate internal controls and procedures to reasonably assure that the financial condition and business prospects of the Company were reported truthfully and accurately and that the Company complied with all applicable state and federal laws. As set forth below Defendants violated these duties and abdicated their oversight responsibilities to the Company. As a result, the Company has been named as a defendant in and

exposed to millions of dollars of liability from securities class action lawsuits and has incurred and will continue to incur legal and other expenses. In addition, Defendant Jeffries has reaped millions of dollars in illicit insider trading profits.

17.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

18.     As further alleged herein, Abercrombie & Fitch's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because the majority of its members (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company and shareholders by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to oversee the Company's compliance with legally mandated disclosure standards and systemic failure to assure that a reasonable information and reporting system existed and/or (2) are not independent from members of Abercrombie & Fitch's Board of Directors who face a substantial likelihood of liability.

## SUBSTANTIVE ALLEGATIONS

19.     During its February 15, 2005 Fourth Quarter 2004 Earnings conference Call, the Company noted that it had adopted a new policy not to provide quarterly guidance to investors. In the Earnings Conference Call, the Company explained that it would, however, provide earnings guidance and would continue to provide monthly sales for its retail chains, including Abercrombie & Fitch and Hollister Co.

20.     With respect to Abercrombie's 2005 annual earnings guidance, the February 15,

2005 press release further stated:

> In the current fiscal year, the Company plans to increase gross
> square-footage by approximately 9% by the end of fiscal 2005
> primarily through opening flagship Abercrombie & Fitch stores in
> New York, Los Angeles and through the addition of approximately
> 55 new Hollister stores. In addition, the Company plans to convert
> approximately three Abercrombie & Fitch and five Abercrombie
> Kids stores into smaller formatted Hollister stores during fiscal
> 2005, the first of which is planned to open during the first quarter.
> The Company also expects to open approximately five RUEHL
> stores.
>
> Assuming net sales growth of approximately 20% in 2005,
> management expects net income per share on a fully diluted basis
> for fiscal 2005 to be in the range of $2.80 to $3.00 per diluted
> share. This does not include the impact on 2005 net income per
> share resulting from the implementation of Statement of Financial
> Accounting Standards No. 123R, "Share Based Payments," which
> will be effective beginning in the third quarter of 2005.

21.     On June 2, 2005, the Company reported denim sales separately for the first time.

It said that May denim sales increased 166%. The June 2 denim figures were received warmly

by Wall Street. In its June 2, 2005 Company Note, Piper Jaffray commented that denim sales

were "a reflection of the company's growing denim mindshare." Thereafter, the share price of

Abercrombie's common stock soared upon the market's reaction to the Company's June 2, 2005

press release.

22.     As later noted by *The Wall Street Journal* in its August 29, 2005 "Heard on The

Street: Abercrombie Stock Sales Draw Concern," column, this new denim figure was reported

as part of an effort to calm investors' worries after analysts noted a glut of high-priced denim at

stores like Abercrombie.

23.     The June 2, 2005 reporting of total Company denim sales was designed to, and

did, operate as guidance to comfort investors resulting in an inflated market for Abercrombie

common stock. On June 2, Abercrombie common stock traded amidst an unusually high trading volume at a high of $65.68 per share and closed at $65.00 per share. The $65.00 per share closing price on June 2 was $7.01 higher than the $57.99 closing price of the stock on the previous day. The Company's stock price rose continuously until its high of $73.14 on July 7, 2005.

24. In a press release filed with the SEC on Form 8-K on July 7, 2005, Abercrombie announced net sales of $221.6 million for the five-week period ended July 2, 2005 which represented a 52% increase over net sales of $146.1 million for the five-week period ended July 3, 2004. Comparable store sales increased 38% over the same period in 2004 and 25% year-to-date. Year-to-date, Abercrombie reported a 39% increase of net sales to $927.4 million from $669.5 million in 2004.

25. June ended on an encouraging note from Defendants, causing Abercrombie's common stock to trade at a high of $74.10 on July 7, $2.89 higher than the previous day's high of $71.21, before closing at a 52-week high of $73.14.

26. While the Company was unabashedly positive in its public statements, the Individual Defendants knew, but failed to reveal, that the Company's margins – a material indicator of its true financial condition – would be lower than expected in its 2005 second fiscal quarter, as compared to the second quarter of 2004. As Vick Khoboyan, a vice president at hedge fund Willowbrook Asset Management subsequently observed, and as reported on August 29, 2005 by The Wall Street Journal: "They didn't give a full picture to investors" when they implied that denim sales were going well because margins were lower than expected. In fact, the Company's bullish report on denim sales served to further buoy investor confidence.

27.     That this information was known to top Abercrombie management but undisclosed to the investing public is evidenced by the Abercrombie common stock trading of Defendant Jeffries. On July 7, Defendant Jeffries, knowingly or recklessly disregarding that these positive results were materially false and misleading, began selling significant amounts of Abercrombie shares. By the end of the following week, Jeffries sold more than 1.5 million shares at prices between $70 and $73.80 per share. Jeffries' proceeds from the sale of 1.5 million shares amounted to approximately $110 million. In the week following, Jeffries sold an additional 111,100 shares at almost $70 per share for which he received proceeds of an additional $8 million. Also, on July 15, 2005, Kessler sold 4,500 Abercrombie shares at $69.80 per share reaping proceeds of $314,190.

28.     Jeffries' sales of Abercrombie stock during the period from July 7, 2005 through July 15, 2005 are set forth below.

| DATE OF SALE | PRICE PER SHARE | NUMBER OF SHARES SOLD |
|---|---|---|
| 7/7/05 | $72.40-$78.80 | 771,082 |
| 7/8/05 | $72.15-$72.97 | 300,000 |
| 7/11/05 | $72.00-$73.48 | 283,500 |
| 7/12/05 | $71.50-$72.15 | 307,164 |
| 7/13/05 | $70.75-$72.42 | 94,900 |
| 7/14/05 | $70.00-$71.00 | 124,900 |
| 7/15/05 | $69.75-$69.91 | 111,100 |

29.     In a press release on Form 8-K filed by Abercrombie with the SEC on August 4, 2005, Abercrombie announced net sales of $191.0 million for the four-week period ended July 30, 2005 which represented a 33% increase over net sales of $143.7 million for the four-week

period ended July 31, 2004. Comparable store sales increased 22% over the same period in 2004. Year-to-date, Abercrombie reported a 38% increase in net sales to $1.118 billion from $813.3 million in 2004. For the year-to-date period, comparable store sales increased 24%. No mention was made of the decrease in the Company's margins.

30.     In a press release filed with the SEC on Form 8-K on August 16, 2005, Abercrombie reported record net income of $57.4 million and net income per share on a fully diluted basis of $0.63 for the Second Quarter ended July 30, 2005 ("Second Quarter").

31.     Jeffries was quoted in the press release as stating:

> We achieved extraordinary like for like and total sales growth this quarter. This success was driven by our focus on core sportswear categories such as denim and knits across all brands and our determination to be the leading inspirational casual apparel company in each of our target customer age groups. We continue to emphasize the aspiration character of our brands by increasing the quality of our product and enhancing the environment, presentation and customer experience in our stores. This has enabled us to attain significant same store sales increases at the same time that we have eliminated sales promotions and realized double digit increases in average unit prices in Abercrombie & Fitch and Abercrombie. We believe that the strategies we have put into place will enable us to continue to grow both our sales and profits in the coming months and years.

32.     With respect to Abercrombie's 2005 annual earnings guidance, the August 16,

2005 press release further stated:

> Based on a sales plan of approximately $2.7 billion for fiscal 2005, the Company expects net income per share on a fully-diluted basis to be in the range of $3.10 to $3.30, an increase from its previously issued guidance of $2.80 to $3.00 per diluted share for fiscal 2005.

> The Company now expects total capital expenditures for fiscal 2005 to be between $265 million and $286 million. The majority of the expenditures are related to new store construction, remodels, and home office investments. These amounts do not reflect construction allowances which are recorded on the balance sheet as a deferred credit as opposed to a reduction in capital spending.

33.     While the Company increased its earnings guidance on August 16, 2005, the market reacted negatively, - - the price of Abercrombie shares fell $2.54 to $61 per share by the close of the market on August 16, 2005 and to $55.75 per share by 4:42 p.m. It had traded at a high of $64.95 on August 15. The stock traded on unusually high volume on August 17, 2005 with a high of only $59.09 and closed at $58.85, down $4.70 from the $63.55 closing price on August 15, 2005. That decrease was a result of the decrease in Company margins (from 70% in the 2004 second quarter to 68% in the 2005 second quarter, below street expectations for incremental improvement and a 180 basis point decline), seen as a key financial indicator, as well as the fact that the Company had, at $.63 per share, in the market's view, well missed the consensus estimate for the quarter of $.69 earnings per share, an estimate based on and fueled by Defendants' prior statements concerning the monthly results and Second Quarter estimate, as well as denim sales. Analysts also expressed concerns over inventories that were up over 67% per foot driven by a significant increase in denim, and the Company's highest level since 1999. This could, in their view, lead to significant markdowns which would negatively affect Company profits.

34.     On August 18, 2005, Jeffries sold an additional 100,000 shares at prices between $58.46 and $58.45 for a profit of approximately $3.5 million, reportedly resuming his high pre-July 2005 trading pattern. As a result of Jeffries' stock sales prior to the rapid decline of Abercrombie's stock price, he avoided approximately $22 million of paper losses by selling 1.62 million shares in July alone. Those sales resulted from exercising about 1.8 million stock options with strike prices of $8 and $23.41 per share. In 2005, Jeffries sold about 2 million shares, netting approximately $144 million, compared to sales of about 600,000 shares in 2004, 950,000 shares in 2003 and 50,000 shares in 2002. Needles to say, Jeffries' July 2005 sales were

unusual in both timing and amount. His weekly sales have averaged about 100,000 shares and he has not sold more than 250,000 shares in any week in the past nine years. Mark Lo Presti, senior quantitative analyst at Thompson Financial, was quoted in the financial press on August 29, 2005 as describing Jeffries' selling as "substantial", noting that "[t]he stock has risen for about a year but his selling wasn't very heavy" until his summer.

35.     In a press release filed with the SEC on Form 8-K on August 29, 2005, Abercrombie announced the departure of Defendant Singer, President and Chief Operating Officer, effective August 31, 2005, citing a "difference in approach" over the Company's international expansion plans. This was the second departure of a top Company executive in four months. Abercrombie's Chief Financial Officer left in April 2005.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

36.     Plaintiff brings this action derivatively in the right and for the benefit of Abercrombie to redress injuries suffered and to be suffered by Abercrombie as a result of breaches of fiduciary duty by the Individual Defendants. This in not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

37.     Plaintiff will adequately and fairly represent the interests of Abercrombie & Fitch and its shareholders in enforcing and prosecuting its rights.

38.     Plaintiff is a holder of Abercrombie & Fitch common stock and was a holder of Abercrombie & Fitch common stock during the period in which the Individual Defendants' wrongful course of conduct alleged herein was occurring through the present.

39.     Abercrombie & Fitch's Board of Directors is currently composed of ten (10) directors – Defendants Jeffries, Bachmann, Brisky, Kessler, Gertmenian, Griffin, Golden and

Limato and Tuttle and Brestle. Each of these Directors, except Tuttle and Brestle, has been named as a defendant herein.

40. As a result of the facts set forth herein, Plaintiff has not made a demand upon the Abercrombie Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because a majority of the members of Abercrombie's Board of Directors is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

        a. As set forth above, each of the Director Defendants exhibited a sustained and systematic failure to fulfill his fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate internal controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur which could not have been an exercise of good faith business judgment and the Defendant Directors face a substantial likelihood of liability for such breaches of fiduciary duties.

        b. The Defendant Directors participated in the drafting, preparation, and/or approval of the various public reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Abercrombie, each of the Defendant Directors had access to the adverse undisclosed information about Abercrombie's business prospects and as particularized herein knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about

Abercrombie, its business and its business prospects issued by the Company materially false and misleading.

c. The Defendant Directors, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. Each Defendant Director was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Defendant Directors was responsible for the accuracy of the public reports and releases detailed herein and the representations contained therein.

d. The Defendant Directors had a responsibility and obligation to assure that all press releases and SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described in this complaint but failed to do so.

e. Defendants Jeffries and Kessler sold large quantities of Abercrombie stock while in possession of non-public material adverse information concerning the Company and face a substantial likelihood of liability as a result of same. The Defendant Directors have taken no action to recover the unlawful insider trading profits reaped by these Defendants.

f. According to the Company's May 12, 2005 proxy, Defendant Directors Gertmenian and Jeffries do not qualify as independent directors under SEC Rules

or New York Stock Exchange rules. Jeffries does not qualify as independent because he is an executive officer of the Company. Gertmenian does not qualify as independent because he is a partner of a law firm that has performed services and will continue to perform services for the Company. Gertmenian's law firm is Vorys Sater, Seymour & Pease, LLP. Gertmenian serves on the firm's executive committee. On its website, Vorys Sater describes itself as general counsel for Abercrombie & Fitch.

g.      Defendant Director Kessler's son-in-law, Thomas Lennox, is employed by the Company as head of Investor Relations and receives in excess of $100,000 per year in compensation from the Company.

h.      Kessler has served as Chairman of New Albany Company, a New Albany, Ohio real estate development firm, since 1988. According to a May 30, 2005 article in *Business Week*, "Flip-flops, Torn Jeans - - and Control," Kessler told Business Week that New Albany Company sold Abercrombie the piece of land used for its corporate headquarters in 1999 after Abercrombie spun off from Limited, Inc. Robert Berner, "Flip-flops, Torn Jeans - - and Control" (Business Week May 30, 2005). Real estate filings for the property show that the price was $12 million. *Id.* According to *Business Week*, Kessler also received a fee from Abercrombie for being part of a 3 person team charged with finding the site. *Id.* "What makes it so bad is that the Chairman of the Compensation Committee is someone the CEO has an interest in having on his side," said Randall S. Thomas, a securities professor at Vanderbilt University School of Law. *Id.*

i.    According to the Company's May 12, 2005 Proxy, Defendant Directors Bachmann, Griffin and Kessler are affiliated with certain charitable organizations to which the Company made contributions during the 2004 fiscal year.

j.    In 2004, Abercrombie & Fitch sponsored the 11th Annual "Up On the Roof Top Gala" fundraiser for the Ohio State University Comprehensive Cancer Center. Abercrombie & Fitch also hosts the Annual A & F Challenge, an event consisting of running, skating and biking. In 2004, the event benefited the Ohio State University Hospital, among other things. Defendant Griffin has been the President and Chief Executive Officer of the Ohio State University Alumni Association since January 2004. Prior thereto, he served as the Associate Director of Athletics at the Ohio State University, Columbus, Ohio from 1994 to 2003 after serving more than 9 years in various positions within the Athletic and Employment Services Departments at the Ohio State University. Defendant Director Bachmann has served in positions of leadership at Ohio State University's James Cancer Hospital.

k.    Defendant Director Bachmann is a former partner of Ernst & Young, LLP, a firm engaged by the Company from time to time to perform non-audit services for the Company and to which the Company paid fees during the 2004 fiscal year.

l.    The Board of Directors has a history of not acting independently of the Company's Chairman and CEO, Defendant Jeffries, and instead acting to further Jeffries' interests to the detriment of the Company. On April 12, 2005, the Company settled a shareholder suit by reducing Jeffries pay package: among other things, it agreed to cut in half a $12 million bonus he would receive for

staying on as CEO through 2008, gave up option grants in 2005 and 2006 and delayed the vesting of a $28 million restricted share award until one year after he retires. The May 30, 2005 *Business Week* article, noted that the suit "drew attention to A&F's [Abercrombie & Fitch's] cozy board."

m.    An August 4, 2004 column in *Bloomberg News*, written by Graef Crystal, a leading expert on CEO compensation, commented on the abusive pay package of Defendant Jeffries which was partially reduced by the shareholder lawsuit:

> Michael Jeffries, the Chief Executive Officer of Abercrombie & Fitch, Co., is batting .333 - - a terrific performance, if only he were a major league baseball player.
>
> Sure, as Jeffries acknowledged in February right after the end of his New Albany, Ohio based retailer's 2003 fiscal year, it was "a tough year in terms of the same-store sales." At the same time, his longer term total return performance is terrible. On the pay rankings, though, he bats them right out of the park.
>
> To get a handle on his pay standing, I compared him with CEO's of 12 other U.S. speciality retailers, all with net sales in the $1 to $2.4 billion range. Abercrombie's net sales for the year ended last January 31 were $1.7 billion.
>
> Over the past three fiscal years:
>
> - - Jeffries $1.1 million average annual salary level put him in the 100th percentile, meaning none of those other CEO's made more.
>
> - - His $2.3 million average annual combination of salary and bonus also put him in the 100th percentile.
>
> - - And for the hat trick, his $22.9 million average annual total pay positioned him - - well, you know where.

\* \* \*

Erratic Performance

For performance: Houston, we have a problem. For the one-, two, three-, four-and five-year time windows, all ended Dec. 31, 2003, Abercrombie's total return ranked it at the 25th, 17th, 42nd, and 25th and zero percentiles, respectively, compared with the other retail CEO's.

\* \* \*

Same Findings

I also compared Jeffries pay with the three-year annual pay earned by 91 CEO's working in a variety of US industries, not just retailing, and all with 2003 net sales in the $1 billion to $2.4 billion range. The findings were essentially the same. Jeffries ranked:

- - 96th percentile for base salary.

- - 88th percentile for base salary and annual bonus combined.

- - 99th percentile for total pay.

Abercrombie's performance against this larger, more heteronegious group was also down in the basement. The percentile ranks for the five-time windows of total return noted above were, respectively, 19th, 14th, 37th, 23rd and 3rd.

Graef Crystal, "Jeffries Takes Abercrombie & Fitch on Pay Ride: Graef

Crystal" (Bloomberg.com August 4, 2004).

n.     Defendants Kessler and Griffin are members of the Company's

Compensation Committee and approved the exorbitant compensation package of

Defendant Jeffries despite the Company's poor performance.

o.     Defendant Jeffries, because of his position and influence over the Board,

was able to obtain the Board's approval of a provision in his contract requiring the

Board to nominate Jeffries as a director during his employment term. Under the

terms of the Company's Amended and Restated Employment Agreement with

Jeffries, the Company is obligated to cause Jeffries to be nominated as a director during his employment term.

p.      Non-employee directors of Abercrombie's Board receive the following compensation: An annual retainer of $55,000 for each director; an annual retainer for each committee chair and member of $25,000 and $12,000 respectively, and other than (1) the chair and members of the Audit Committee who will each receive $40,000 and $25,000 respectively, and (2) the members of the Executive Committee who will each receive $7,500; annual awards of restricted stock in the amount of 3,000 shares, the minimum value of the grant will be $120,000 (should the stock price on the grant date be lower than $40 per share, the number of restricted stock units granted will be automatically increased to provide a minimum grant date value of $120,000).      The Defendant Directors would jeopardize this lucrative compensation package by suing the CEO and Chairman of the Board, Jeffries, or Griffin and Kessler, members of the Compensation Committee.

q.      Defendants Golden, Bachmann and Brisky were members of the Company's Board of Directors' Audit Committee during the Relevant Period. According to the Company's May 2005 proxy, the Audit Committee's duties include assisting the Board in its oversight of the Company's compliance with legal and regulatory requirements. These Defendants failed in these duties in that they failed to implement adequate internal controls and procedures which if implemented, could have prevented the wrongdoing alleged herein, including

violations of state and federal securities laws. These Defendants face a substantial likelihood of liability as a result of same.

r.    Directors Tuttle and Singer are believed to have longstanding personal and business relationships with each other. Director Tuttle worked with Defendant Singer during his tenure at the Gucci Group, N.V.

s.    In order to bring this suit, the Individual Defendants would be forced to sue themselves which they will not do, thereby excusing demand;

t.    Abercrombie & Fitch has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Defendant Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct which caused the filing of securities class actions against the Company;

u.    If the Director Defendants were to bring this derivative action against themselves, they would thereby expose their own recklessness and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law which have been brought against the Company and Defendants Jeffries and Singer, among others. Such admissions would impair the Company's and their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.

41.    Plaintiff has not made any demand on the shareholders of Abercrombie to institute this action since demand would be a futile and useless act for the following reasons:

a.     Abercrombie is a publicly traded company with thousands of shareholders;

b.     Making demand on such a large number of shareholders would be impossible for Plaintiff, who has no way of finding out the names and addresses, or telephone numbers of shareholders; and

c.     Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could even be individually identified.

## FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duty

42.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

43.     As alleged in detail herein, the Individual Defendants had a duty to conduct themselves in good faith and in a diligent, honest and prudent manner and to comply with all applicable state and federal laws. In addition the Individual Defendants had a duty to exercise good faith and diligence in maintaining the Company's image and reputation, which is essential to the Company's business.

44.     The Individual Defendants breached their fiduciary duties by engaging in and/or recklessly permitting the misleading of the public through the Company's inaccurate and/or untrue statements regarding the Company's business, business prospects and expected revenues and earnings which served to destroy the reputation and credibility of Abercrombie.

45.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

46.     As a direct and proximate result of the Individual Defendants foregoing breaches of fiduciary duties, Abercrombie has suffered damages, including, but not limited to costs incurred in retaining attorneys as well as being exposed to millions of dollars in liability from defrauded investors.

## SECOND CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duty
### through Unjust Enrichment and Abuse of Control

47.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

48.     The Individual Defendants' misconduct and/or inaction alleged herein constituted an abuse of their ability to control and influence Abercrombie, for which they are legally responsible.

49.     As a direct and proximate result of the Individual Defendants' abuse of control, Abercrombie has sustained significant damages and Defendants have received benefits that they should not in fairness retain and the Individual Defendants are liable to the Company for same.

## THIRD CAUSE OF ACTION
### Against the Individual Defendants for Breach of fiduciary through Mismanagement

50.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

51.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing Abercrombie in a manner consistent with the operations of a publicly held corporation.

52.     As a direct and proximate result of the Individual Defendants' mismanagement, Abercrombie has sustained significant damages, arising out of the alleged material misstatements

to the investing public, damages to the Company arising from the pendency of the securities class action lawsuits and the Individual Defendants are liable to the Company for all damages flowing therefrom, including the obligations for common law indemnification and contribution.

53.     As detailed more fully herein, the Defendants each have and had a duty to Abercrombie and its shareholders to prudently supervise, manage and control Abercrombie's operations.

54.     The Defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of Abercrombie in a manner consistent with the operations of a publicly-held corporation.

55.     By subjecting Abercrombie to the unreasonable risk of liability by failing to maintain sufficient controls and procedures and actively participating in, or passively allowing, federal securities law violations as further described herein, the Defendants breached their duties of good faith, due care and diligence in the management and administration of Abercrombie's affairs and in the use and preservation of Abercrombie's assets.

56.     The Defendants caused the Company to engage in these actions, and were aware of the problems and probable damage to the Company associated with such actions. During the course of the discharge of their duties, the Defendants knew or should have known of the unreasonable risks and probable damage to the Company associated with their actions, yet the Defendants caused or recklessly permitted Abercrombie to engage in this wrongful course of conduct which they knew had an unreasonable risk of material loss to Abercrombie, thus breaching their duties to both Abercrombie and its shareholders. As a result, the Defendants did not act in good faith and intentionally mismanaged and/or aided and abetted the mismanagement of Abercrombie & Fitch and its assets.

57. As a proximate result thereof, Abercrombie has been damaged and will continue to suffer damages, and has sustained and will continue to sustain irreparable injury to its reputation.

## FOURTH CAUSE OF ACTION
### Against Defendants Jeffries and Kessler for Insider Trading

58. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

59. At the time that the Insider Trading Defendants, Jeffries and Kessler, sold their Abercrombie stock, by reason of their director and/or executive positions with Abercrombie, these Defendants had access to and knew adverse material information regarding Abercrombie, including the materially adverse information alleged herein. That information was not generally available to the public or to the securities markets, and these Insider Trading Defendants knew it was not available. Had such information been generally available, it would have significantly reduced the market price of Abercrombie shares.

60. In selling their Abercrombie shares with knowledge of material adverse non-public information, the Insider Trading Defendants violated their duties of good faith and loyalty to the Company and are liable for the illicit insider trading profits they received as the result of same. Plaintiff seeks those damages on behalf of Abercrombie with respect to the sales of Abercrombie stock described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

        A.      Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants breaches of fiduciary duty;

B.    Awarding to Plaintiff the costs of this action, including reasonable attorneys' fees, accountants and expert fees, costs and expenses; and

C.    Granting such other relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 16, 2005

Respectfully submitted,

Stephen E. Chappelear
HAHN, LOESER + PARKS LLP
65 E. State Street, Suite 1400
Columbus, OH 43215
(614) 233-5148
Fax: (614) 233-5149
sechappelear@hahnlaw.com

William B. Federman OBA # 2853
**FEDERMAN & SHERWOOD**
120 N. Robinson Avenue, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax: (405) 239-2112

-and-
2926 Maple Ave., Suite 200
Dallas, TX 75201
wfederman@aol.com

*Attorneys for Plaintiff*